Rubel Bros., Inc., Appellant, Impleaded with Albert H. Acker-
man, Plaintiff, v. Dumont Coal & Ice Company, Inc.,
Respondent.

Second Department, February 17, 1922.

Deeds — restrictive covenants — action to restrain defendant from carry-
ing on coal and ice business on certain lot — restrictive covenant
obtained by plaintiff from original owner after he had agreed to sell
to defendant's predecessor — defendant's predecessor sued for and
recovered damages for breach of said contract — mortgage on property
purchased by representative of plaintiff — foreclosure decree and deed
subject to covenant — defendant's predecessor in title purchased at
foreclosure and sold to defendant by deed without reference to restric-
tion — restrictive covenant enforcible against grantee taking premises
with knowledge thereof — corporations owned by same persons treated
in equity as same — defendant had knowledge of restriction — enforce-
ment of restriction will not give plaintiff monopoly — enforcement not
inequitable — injunction granted restraining defendant from con-
ducting coal and ice business on lot.

In an action to obtain an injunction restraining the defendant from carrying on
the coal and ice business on a certain piece of land in the borough of Brooklyn,
New York city, it appeared that the original owner of the land in question
contracted to sell it to the Municipal Coal Company, an organization composed
of small coal dealers; that after the execution of that contract the owner entered
into a written contract with the plaintiff's predecessor in title and a third person
who owned adjoining property and knew of the contract of sale, restricting the
use of the property in question so that it could not be used for conducting thereon
any coal or ice business; that the owner of the parcel of land having breached
his contract of sale was sued by the Municipal Coal Company which recovered
the deposit made at the time of the signing of the contract and damages for
the breach; that subsequently the plaintiff acquired title to one of the parcels;
that thereafter an action was commenced to foreclose a mortgage on the prop-
erty in question, but before the decree was entered a representative of the
plaintiff purchased the mortgage for the purpose of protecting the restrictive
covenant; that the plaintiff's representative who purchased the mortgage was
substituted as plaintiff in the foreclosure action and judgment was entered
which directed that the mortgaged premises be sold subject to the restrictive
covenant, although the mortgage, ante-dating the covenant, was not subject
to it; that the Municipal Coal Company purchased the property at the fore-
closure sale subject to the restriction and thereafter, before taking the deed,
applied to the court in which the judgment was rendered to direct the referee
to give a deed free from restrictions, but said application was denied and no
appeal therefrom was taken; that the said Municipal Coal Company observed
the restriction for about a year and then transferred the property to a third
person by a deed which contained no reference to the restrictive covenant and
that he, in turn, transferred the property to the defendant without reference
to the restrictive covenant.

Held, that a court of equity will enforce a restrictive covenant against the grantee
of land who took title with full knowledge of its existence, although it be
omitted in the deed, intentionally or otherwise, and the question in such a case
is not whether the covenant runs with the land, but whether a party shall be
permitted to use the land inconsistently with the contract entered into by his
vendor, and with notice of which he purchased.

While the defendant and the Municipal Coal Company are apparently separate
and distinct entities, there can be no doubt on the evidence in the case that

the defendant is owned and controlled by the same people as the Municipal Coal Company and was organized for the very purpose of avoiding the restriction imposed upon the land and should be treated in equity as though it were the Municipal Coal Company.

On that theory, if it can be said that the persons owning the defendant and the Municipal Coal Company were wronged by plaintiff's act in procuring the restrictive covenant after the owner of the land had agreed to sell it to the latter, that wrong was righted when the Municipal Coal Company sued for and recovered damages for the breach of the contract of sale, which damages were ultimately paid by the plaintiff from the surplus moneys on the foreclosure sale.

Furthermore, if said corporations are treated as separate legal entities, it was shown that the defendant took title with full knowledge of the existence of the restrictive covenant binding upon its vendor, and is bound thereby.

The conclusion of the trial court that the enforcement of the covenant would give the plaintiff a monopoly so far as the local small coal dealers were concerned is not sustained by the evidence which establishes conclusively that there was free field for the coal business in that locality and much vacant land adaptable to the coal business, and in fact there existed sharp competition in the trade.

The suggestion that the enforcement of the restriction will work a hardship to the poor of the vicinity, or that it will in some way prevent the consumers from obtaining coal at moderate prices, is important and should have weight with a court of equity, but the evidence clearly shows that the small coal dealers were charging more for coal sold by them than the plaintiff was charging, and so it cannot be said that the principles of equity and fair dealing prevent the plaintiff from enforcing the restrictive covenant against the defendant.

Judgment of the lower court reversed and a judgment directed in favor of the plaintiff restraining the defendant from conducting a coal and ice business on the land in question.

Blackmar, P. J., dissents, with opinion.

Appeal by plaintiff, Rubel Bros., Inc., from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Kings on the 24th day of November, 1920, upon the decision of the court rendered after a trial at the Kings Special Term.

Plaintiffs brought this action to obtain an injunction restraining the defendant from carrying on the coal and ice business on a parcel of land in the block between Rockaway and Thatford avenues, in the East New York section of Brooklyn. The defendant's property has a frontage of between 250 and 300 feet on Rockaway avenue on the west and Thatford avenue on the east. The plaintiff bases its action upon a written agreement dated September 16, 1916, and recorded in the register's office on September 18, 1916, made between the Empire City Lumber Company which then owned the parcel of land in question, of the first part, Albert H. Ackerman of the second part, and Rockaview Coal and Ice Corporation (the predecessor in title of plaintiff, the capital stock of which corporation was owned by Samuel and Isidor Rubel and their sister, Mrs. Annie Bass, at the date of the agreement referred to) of the third part. The Empire City Lumber Company agrees with the other parties to the agreement that until January 1, 1937, the premises

in question shall not be used for conducting thereon any coal or ice business, that no coal or ice shall be stored thereon, and that no railroad switch, siding or connection shall be maintained on the property for the transportation of coal or ice. It is agreed that the restrictive covenant shall bind the Empire City Company, its successors and assigns, that it shall run with the land and inure to the benefit of the parties of the second and third parts, their successors and assigns.

Subsequent to the date of the agreement, to wit, on March 21, 1917, the Rockaview Company conveyed all its land and its rights and interests in the agreement referred to, to the plaintiff Rubel Bros., Inc. Before the trial of the action the plaintiff Ackerman also conveyed all his land and rights in the restrictive covenant to the plaintiff Rubel Bros., Inc.

Consideration of the issues involved may be helped by the following diagram of the three parcels of land which were described in the recitals in the contract which is the basis of the action.

In November, 1917, one Belanowsky, who held a mortgage for $10,000 covering the restricted premises, began a foreclosure

action in the County Court of Kings county. Early in 1918 when the foreclosure action had proceeded to a point where the plaintiff was about to apply for judgment, Rubel Bros., Inc., purchased the mortgage from Belanowsky and it was assigned to Annie Bass, a sister of the Rubel brothers. Mrs. Bass was also an officer and director of the Rockaview Corporation (the party of the third part to the restrictive covenant) and was the owner and holder of the largest part of the stock of the corporation. She made affidavit in the foreclosure action that the money paid for the assignment of the mortgage was the money of the corporation. The mortgage was purchased and the unpaid balance of $9,500 paid to the original mortgagee by Mrs. Bass in the interest of herself and her brothers, the Rubels, to protect the restrictive covenant. An order was made upon her application by which she was substituted as plaintiff in the foreclosure action and judgment was entered which directed that the mortgaged premises be sold subject to the restrictive covenant, although the mortgage, antedating the covenant, was not subject to it.

The predecessor of the defendant Dumont Coal & Ice Company, Inc., was a concern known as the Municipal Coal Company. This was an association of " small dealers " in coal and ice in what is known as the Brownsville district of Brooklyn, managed by certain individuals, among others Krasner and Black. In September, 1916, the Rubels were establishing an elaborate plant on parcel No. 3, shown on the diagram. Parcel No. 1 was used as a lumber yard by the Empire City Lumber Company. Parcel No. 2 was owned by Ackerman of Thatford & Ackerman, coal dealers in East New York, but was not in use for the coal and ice business, being leased by Ackerman to the Empire City Lumber Company and used as a lumber yard in connection with parcel No. 1. There was a siding from the Long Island railroad running into Rubel's parcel No. 3, and another siding running into Ackerman's parcel No. 2. The Empire City Lumber Company had as its president one Steinfield, and at this particular time it was short of money. Coincident with Rubel's completion of his coal pockets and the opening up of " Rubel Bros. Inc.," Krasner and his colleagues, the so-called small dealers, obtained a contract from Steinfield by which he agreed to sell them parcel No. 1 for $15,000, title to be closed on September 19, 1916. They stated their intention to build a coal yard on parcel No. 1, in competition with the Rubel corporation on parcel No. 3.

Rubel and Ackerman thereupon went to Steinfield and procured the restrictive agreement of September 16, 1916, prohibiting the coal business on parcel No. 1. For this they loaned to the Empire

City Company $3,000 cash, taking a second mortgage on parcel No. 1, and Ackerman reduced the rental which Steinfield was paying for parcel No. 2 and shortened the term of the lease. Steinfield's story is that he had agreed to sell the land because he had no money to develop his lumber business. That with the $3,000 and the modification made in his lease of parcel No. 2 reducing rent and term, he was enabled to continue in business and the necessity for selling the land to Krasner and his associates was obviated. But the restrictive covenant prevented the sale to the Municipal Coal Company. Steinfield broke his contract with Krasner and his associates knowing at the time that their object was to start in business in opposition to Rubel.

The Municipal Coal Company rejected the title to parcel No. 1 on September 19, 1916, on account of the restrictive covenant, and thereafter brought an action against the Empire Company and recovered the deposit made on the contract, also $500 damages for Steinfield's breach of the contract in making the restrictive agreement.

The Municipal Coal Company having thus sued for and recovered damages because of the placing of the restrictive covenant upon parcel No. 1, in February, 1918, with full notice of the restriction, and with notice that it had been inserted in the foreclosure judgment, purchased parcel No. 1 at the foreclosure sale for $13,500, which was $1,500 less than they had agreed to pay the Empire City Lumber Company for the land.

At the referee's sale they filed a protest against the sale of the property subject to restrictions, but they purchased the property subject to the restriction, and thereafter, before taking the deed, applied to the County Court in which the judgment was rendered to direct the referee to give a deed free from the restriction. The County Court denied the motion. No appeal was taken and no motion was made to set aside the sale. The Municipal Coal Company thereafter took the referee's deed to parcel No. 1, dated March 7, 1918, containing the restriction.

For a year thereafter the Municipal Coal Company remained in possession of the property, observing the restriction. On February 13, 1919, two deeds were recorded — one dated December 17, 1918, from the Municipal Coal Company to Moses Malach, and the other dated January 7, 1919, from Moses Malach to the defendant Dumont Coal & Ice Co., Inc.

There is no reference to the restrictive covenant in either deed. Moses Malach was a retail fish dealer conducting a store in a tenement house at Dumont and Stone avenues. He dealt with Isaac Allen who, he says, was his lawyer and also the lawyer for

the Municipal Coal Company. Malach says he paid no money. Mr. Isaac Allen, the lawyer for the Municipal Coal Company which held the property under the referee's deed containing restrictions as to its use, testified on the trial of this action that he advised the Municipal Coal Company that they would not be permitted to establish a coal yard on the property. He says, " In a few weeks thereafter they [the Municipal Coal Company] brought over Mr. Malach," and he testified that he induced the fish dealer to buy the property for the purpose of going into the coal business and that " it appealed to him," but he continues, Malach " did not have much confidence in the stability of .these people, referring to the stockholders of the Municipal Coal Company," and " in a few weeks " he found it would be impossible for him to go into the coal business, and then Mr. Allen drew the deed to the Dumont Coal Company, the defendant, which was organized in January, 1919.

Mr. Allen testified that the deed from the Municipal Coal Company to Malach remained in his possession and was never delivered to Malach, and that when he had organized the defendant corporation, he drew a new deed from Malach to defendant and filed both deeds in the register's office.

Immediately after the organization of the defendant company and the transaction of the Malach deeds in February, 1919, the defendant began preparations to install a coal and ice business upon the restricted property.

The plaintiff brought this action to restrain such use. After trial at Special Term the complaint was dismissed upon the merits, and the plaintiffs appeal.

*Almet F. Jenks* [*Samuel A. Telsey* with him on the brief], for the appellant.

*Alfred G. Reeves* [*Joseph H. Kutner* with him on the brief], for the respondent.

KELLY, J.:

The learned trial justice found as matter of fact, properly I think, that at the time Rubel and Ackerman procured the restrictive covenant from the Empire City Lumber Company, they knew that the Empire Company had contracted to sell the land to the Municipal Coal Company and that the covenant was made for the purpose of preventing the sale to Krasner and his associates. And there can be no doubt that Rubel's purchase of the first mortgage in process of foreclosure, and the insertion of the restrictive covenant in the judgment and in the referee's deed was for the purpose of protecting the restrictive covenant. The learned trial

justice decided that the restrictive covenant was not an easement or covenant running with the land, that it was a personal contract, and that while a court of equity will sometimes enforce such a covenant on the alienee of lands on principles aside from the existence of an easement or the capacity of a covenant to run with the land, still, in the case at bar he was of opinion that Rubel's conduct in obtaining the restrictive covenant was wrongful and inequitable towards the associated small coal dealers represented by defendant. And while the restrictive covenant could not be said to be in restraint of trade, because it affected only this single plot of land with abundant room for coal and ice plants in the immediate neighborhood, the learned justice concluded that the enforcement of the restriction would give the plaintiff a monopoly so far as the local small dealers were concerned, and in consequence the poor people of a crowded city district would be deprived of the benefit which would accrue from carrying on a competitive coal business upon the property.    (111 Misc. Rep. 658.)

I am unable to agree with the learned justice in his conclusions. Assuming without deciding that the learned justice is right in his decision that the restrictive covenant does not run with the land and does not create a negative easement in the restricted parcel for the benefit of the lands owned by the plaintiff, still a court of equity will enforce a restrictive covenant against the grantee of land who took title through a deed reciting the covenant and subject thereto, or against a grantee who took title with full knowledge of its existence although it be omitted in the deed, intentionally or otherwise.    Because, as Lord Chancellor COTTENHAM said in 1848, " the question is, not whether the covenant runs with the land, but whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased." (*Tulk* v. *Moxhay*, 2 Phill. 774.)    The Court of Appeals said through Judge DANFORTH in *Hodge* v. *Sloan* (107 N. Y. 244, 250): " In order to uphold the liability of the successor in title, it is not necessary that the covenant should be one technically attaching to and concerning the land and so running with the title.    It is enough that a purchaser has notice of it.    The question in equity being, as is said in *Tulk* v. *Moxhay* (11 Beav. 571; 2 Phillips, 774), not whether the covenant ran with the land, but whether a party shall be permitted to use the land inconsistently with the contract entered into by his vendor, and with notice of which he purchased. This principle was applied in *Tallmadge* v. *East River Bank* (26 N. Y. 105), where the equity in regard to the manner of improvement and occupation of certain land grew out of a parol contract

made by the owner with the purchaser, and was held binding upon a subsequent purchaser with notice, although his legal title was absolute and unrestricted."

Despite the fact that the question involves " a judicial quarrel almost as venerable as the common law itself, and open yet to vigorous dispute " (*Mygatt* v. *Coe*, 142 N. Y. 78, 82), and although " There has been much judicial writing upon the subject of restrictive covenants, and as may be anticipated from the very nature of the topic, the cases abound in fine and subtle distinctions which have been invented either to overcome the rigor of the common law in courts of equitable cognizance, or to adapt the settled forms of relief to fit special cases. There are many decisions upon this branch of the law which appear to be in hopeless conflict with each other, but which are easily reconcilable when their peculiar circumstances are understood " (*Korn* v. *Campbell*, 192 N. Y. 490, 494), the principle laid down in *Tulk* v. *Moxhay* (*supra*) appeals to our notions of fairness and equity as applied to the facts in the case at bar. There can be no doubt on the evidence in this case that the defendant Dumont Coal & Ice Company, Inc., is the Municipal Coal Company in another garb under a different corporate title, owned and controlled by the same people, and organized for the very purpose of avoiding the restriction imposed upon the land by the agreement of 1916, and expressly stated in the referee's deed to the Municipal Company in 1918. If Rubel's conduct in obtaining the restrictive covenant prevented the original purchase of the land by the Municipal Company at the contract price of $15,000 so that it might set up a competing coal business, and if Rubel's action was inequitable, unfair or unconscionable as against the Municipal Company, as stated by the learned trial justice, but which I cannot concede upon the evidence in the case, still the Municipal Company did not bring an action to cancel the restriction or to avoid it. They sued for and recovered back the deposit made upon their contract to purchase, and demanded money damages for the breach of the agreement. And they recovered damages and it was Rubel who paid the damages out of the surplus moneys in the foreclosure action where the referee held that the Municipal Company had the first lien upon such surplus moneys. If these gentlemen were wronged by Rubel's attempt to protect his investment in his new coal business from a competitor next door, they elected to look for hard cash instead of alleging that they had been wronged and that they should be permitted to take the land free from restrictions upon payment of the $15,000 consideration mentioned in their contract. And having recovered a judgment for their damages, they appeared

at the foreclosure sale and bid on the same land in opposition to Rubel, securing the property subject to the restriction for $13,500, which was $1,500 less than the original price they agreed to pay for it.   And having collected the damages for the breach of the agreement, induced it may be by Rubel, and having saved $1,500 in addition by the decreased price obtained for the property subject to the restriction, they accepted the referee's deed containing the restriction.   When the County Court refused to strike it out, they did not appeal, they took the title and observed the restriction for a year or more, when they set about avoiding the effect of the restrictive covenant for which Rubel had paid, first to the original owner, secondly to the Municipal Company in damages, and thirdly by the depreciation in the purchase price of the land from $15,000 to $13,500.   The organization of the defendant company, the manipulation of the title through the fish dealer Malach by deeds omitting the restriction, all seem very transparent transactions.   It would seem that if Rubel sinned in endeavoring to protect himself from the continued onslaughts of the " small coal dealers," he expiated his offense when on their demand he paid them the damages occasioned by his transgression.   They gave up their claim to the land and took the money damages instead.   When they came afterwards at the foreclosure sale and purchased the property subject to the restriction, it seems to me they were at arm's length with Rubel.   They were under a new dispensation.   They knew what they were doing.   They took title subject to the restriction.   The evidence is that their attorney, Mr. Allen, advised them that the restriction was binding on them. After a year, with Rubel's business prospering, the temptation was too great and they organized the defendant corporation for the purpose of striking at Rubel again through the execution of the deed to Malach and the deed from Malach to the defendant, from which deeds the restriction was intentionally omitted.   I think in equity the defendant corporation is really the Municipal Coal Company.   I think Rubel, despite the wrongdoing charged to him, has bought and paid them for the restriction, but if they are a separate legal entity the question still is as propounded by the Lord Chancellor, " whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased."

It is difficult to apply the principles of conscience and fair dealing and equity in some modern business transactions.   The Rubel Brothers and the independent " small coal dealers " were, it seems to me, all engaged in the effort to make money.   They were all in the coal business.   The evidence shows that the Rubels but a

few years since were " small coal dealers " themselves, selling coal on a small scale and with a single horse and wagon in competition with these gentlemen who are now following them up. Apparently they have been more successful than their associates. They have acquired various coal plants in the locality, but it is idle to assert that they have any monopoly of the coal business in this section of Brooklyn. The evidence at the trial showed conclusively that there was a free field for the coal industry in the Brownsville section, and witnesses were called who testified to active competition in the trade by other coal dealers. Modern methods of delivery make the location of the coal yard of minor importance, but as matter of fact there are other coal yards in Brownsville and East New York. Indeed, the learned trial justice concedes in his opinion that the restrictive covenant cannot be said to be in restraint of trade. And the uncontradicted evidence is that there are still many acres of vacant land in the locality adaptable to the coal business besides this particular restricted lot. The suggestion by the learned trial justice that the enforcement of the restriction will work hardship to the poor, or that it will in some way prevent the consumers from obtaining coal at moderate prices, is important and should have weight with a court of equity, but to say that the defendants are actuated by motives of philanthropy seems absurd in view of the evidence of Mr. Yablonsky, one of the " small dealers " who are championing the cause of the poor: " Q. Now, how much difference, how much cheaper does Rubel Bros. sell a bag of coal near you than what you get? A. He sells them for sixty cents a bag, and I sell them for eighty cents a bag. Q. So that these poor people that you and all the stockholders of the Dumont Coal Co. are talking about, when they buy a bag of coal at a station that Rubel Bros. has, they get it for twenty cents cheaper than what they get it for from you; is that right? A. Yes. Q. Now, you know that Rubel Bros. has a number of such stations where they have this ice and coal — ice during the Summer and coal during the Winter — all through that general section? A. Yes. Q. And you say the reason that Rubel Bros. are able to do that is because Rubel Bros. have large coal pockets and coal yards and buy the coal cheaper, is that it? A. Certainly, and they pay cheaper for the coal. I have got to work hard." I am, therefore, compelled to disagree with the conclusion of the learned justice at Special Term that principles of equity and fair dealing prevent the plaintiff from enforcing the restrictive covenant against the defendant, as well as with his statement that " there is nothing that the Municipal Coal Company has or has not done which precludes the court from refusing to plaintiffs equitable relief on

the ground of their wrongful and unconscionable conduct in obtaining the restrictive agreement." The original wrong, if it was a wrong, was condoned by the defendants when they took Rubel's money in payment of their damages, and the Municipal Coal Company is really before the court in the guise of a new defendant corporation endeavoring by dubious methods to avoid a restrictive covenant of which they had full notice when they purchased the land. These views are in accord with the conclusions of the Special Term upon the original motion for a preliminary injunction in this case. (*Rubel Bros., Inc.,* v. *Dumont Coal & Ice Co., Inc.,* 110 Misc. Rep. 32.)

I, therefore, recommend that the judgment appealed from be reversed, with costs, and that judgment be directed for the plaintiff as prayed for in the complaint, with costs. There should be appropriate reversals of the findings of fact made by the Special Term inconsistent with this decision, and new findings of fact in accordance therewith made where necessary.

RICH, JAYCOX and MANNING, JJ., concur; BLACKMAR, P. J., reads for affirmance.

BLACKMAR, P. J. (dissenting):

I think the judgment should be affirmed, and, therefore, dissent.

The contract of September 16, 1916, did not grant to the Rockaview Coal and Ice Company, and to Ackerman, any interest in the land of the Empire City Lumber Company. The covenant contained in such contract is, I think, a personal covenant. The opinion of Mr. Justice SCUDDER (111 Misc. Rep. 658) on this point appears to me sound. The plaintiff, therefore, cannot maintain this action for an injunction, basing his claim upon a property right in the land of the defendant. In other words, the land of the defendant is not subject to an easement in behalf of and attached to the land of the plaintiff.

If, then, the plaintiff has any cause of action, it does not rest upon a property right, but upon the broad claim that a court of equity will not permit a grantee of one who has made a covenant restricting the use of his land, to violate such covenant. Such cause of action rests upon the inherent power of a court of equity to do justice and equity between the parties, and the right to the complete use of land is never restrained because the grantor of the owner has made a contract regarding this use which does not amount to an easement unless the principles of right, justice and equity demand it as an alternative to a wrong.

In this case the so-called restrictive covenant was obtained by

the plaintiff by the perpetration of a fraud. The original owner of the lot, the use of which, for the purpose of dealing in coal, is sought to be restrained, was under contract to sell the same to certain dealers in coal, who had formed a corporation to purchase it and enter into the coal business in competition with the plaintiff. While this contract was pending, and known to the plaintiff's grantors, they procured the contract of September 16, 1916, which burdened the title of the vendor in the contract of sale, not only with the covenant as to its use, but with a second mortgage. The purchaser was, therefore, compelled to reject it. This amounted to a fraud upon the purchaser (*Gonzales* v. *Kentucky Derby Co.,* 197 App. Div. 277), and this fraud is the origin of the promise of the predecessor in title of the defendant which it is sought, by this action, to enforce as against the defendant. It is not a question whether the other party to the contract has received compensation for the wrong so done it. Conceding that it has, it is none the less true that the right of the plaintiff was conceived in iniquity. It is a struggle between certain coal dealers, whom the defendant represents, on the one hand, and the plaintiff, which seeks to exclude competition, on the other. The plaintiff appeals to a court of equity to aid it, basing its claim to relief on a contract procured by a fraud upon prospective dealers in coal, now represented by defendant. The trial court justly and properly, I think, refused to aid in the consummation of the fraud. (*Hocking Valley R. Co.* v. *Barbour,* 190 App. Div. 341; *Roberts* v. *Criss,* 266 Fed. Rep. 296.)

Judgment reversed, with costs, and judgment directed for the plaintiff, with costs. The findings are to be modified in the order in accordance with the opinion by KELLY, J. Settle order on notice.